# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 3:23-mj-08003 |
| | : | |
| Plaintiff, | : | |
| | : | MAGISTRATE JUDGE DARRELL CLAY |
| v. | : | |
| | : | |
| WHITNEY M. DURANT, | : | **SENTENCING MEMORANDUM** |
| | : | |
| Defendant. | : | |

Defendant Whitney M. Durant (Soren Monroe), through undersigned counsel, submits the instant Sentencing Memorandum for the Court's consideration and requests a sentence, as calculated and reviewed pursuant to Title 18, United States Code §§ 3553(a) and 3661, that is sufficient but not greater than necessary to achieve the statutory goals of sentencing. Counsel attaches the following Memorandum to assist the Court in fashioning Ms. Durant's sentence.

                                                  Respectfully submitted,

                                                  /s/ Sarah Gelsomino

                                                  Sarah Gelsomino, 0084340
                                                  Friedman, Gilbert + Gerhardstein
                                                  50 Public Square, Ste. 1900
                                                  Cleveland, Ohio 44113
                                                  (216) 241-1430

                                                  Attorney for Defendant

# MEMORANDUM

## I. Introduction.

On July 5, 2023, Defendant, Whitney M. Durant, also known as Soren Monroe ("Soren"), was named in a one count Information filed in the United States District Court for the Northern District of Ohio. Count 1 charged Soren with violating the Freedom of Access to Clinic Entrances (FACE Act) on April 15, 2023, in violation of 18 U.S.C. § 248(a)(3) and 18 U.S.C. § 248(b). On December 8, 2023, Soren pled guilty to the one-count Information.

## II. Background.

The Freedom of Access to Clinic Entrances (FACE) Act was enacted in 1994, to address growing concerns over violence and obstruction at clinics providing abortion services. FACE prohibits violent, threatening, damaging and obstructive conduct intended to injure, intimidate, or interfere with the right to seek, obtain or provide "reproductive health services." The statute, 18 U.S.C. § 248, creates federal jurisdiction and penalties for a person who:

1. By force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services; or

2. Intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services.

During the years 1978 to 1993, the United States and Canada witnessed a significant uptick in aggressive and criminal actions targeting abortion clinics and providers. According to data from the National Abortion Federation (NAF), the violence and intimidation tactics during

2

this time included 1 murder, 3 attempted murders, 406 death threats, 179 assaults or batteries, and 5 kidnappings of individuals associated with abortion services. Additionally, property crimes against these providers were alarmingly high, encompassing 28 bombings, 113 arsons, 61 attempts at bombing or arson, 297 bomb threats, 543 acts of vandalism, and 72 uses of butyric acid or "stink bombs" to disrupt clinic operations.[1]

In a notable escalation of anti-abortion activism, April 1992 saw thousands of protesters converge on the entrances of Buffalo, New York's abortion clinics. This was part of a planned month-long campaign of picketing and blockades aimed at dissuading women from seeking abortions.[2] The first week of protests resulted in over 300 arrests after a series of confrontations.[3] The Army of God, an anti-abortion group, was particularly notorious for its violent approach during this period. This group alone was responsible for over one hundred bombings and arsons targeting clinics, in addition to invading more than three hundred clinics and committing vandalism against over four hundred.[4] In 1993, the discovery of the Army of God Manual at the home of Shelley Shannon, an activist with the group, revealed a tactical guide advocating for arson, chemical attacks, and bombings.[5] Shannon was subsequently convicted for the attempted murder of abortion provider Dr. George Tiller within the same year.[6]

Some anti-abortion activists went further, engaging in the stalking of medical personnel and publishing their photographs on "Wanted for Murder" posters, contributing to a climate of

---

[1] www.prochoice.org/pubs_research/publications/downloads/about_abortion/violence_stats.pdf
[2] https://web.archive.org/web/20141101002733/https://www.nytimes.com/1992/03/07/nyregion/buffalo-braces-for-renewal-of-abortion-protests.html
[3] https://www.upi.com/Archives/1992/04/26/Buffalo-quiet-on-seventh-day-of-Spring-of-Life/6184704260800/
[4] https://web.archive.org/web/20161110071743/http://www.nytimes.com/1993/03/12/opinion/the-death-of-dr-gunn.html#
[5] https://web.archive.org/web/20100602025830/http://www.emich.edu/cerns/downloads/papers/PoliceStaff/Unsorted/Army%20of%20God%20The%20Perceived%20War%20and%20Holocaust.pdf#
[6] https://web.archive.org/web/20100712010828/http://www.billwarnerpi.com/2009/05/dr-george-tiller-murdered-by-army-of.html#

fear and intimidation.[7] The culmination of this wave of violence occurred in March 1993 with the murder of Dr. David Gunn by Michael F. Griffin outside the Pensacola Women's Medical Services clinic in Florida.[8] Dr. Gunn was targeted for his role in providing abortion services.

The increasing violence posed significant challenges for local law enforcement, which was often criticized for its inadequate response to the escalating tensions.[9] This situation led some senators and representatives to conclude that such unlawful activities were not only undermining the constitutional right of women to access reproductive health care services, including abortion—a right affirmed by the Supreme Court's Roe v. Wade decision in 1973—but also necessitated federal action to protect both providers and recipients of abortion services, leading to the eventual enactment of protective measures such as the FACE Act.

In recent years, however, there has been a noticeable shift in how the FACE Act is being applied. It has begun to be used to protect crisis pregnancy centers and other organizations that do not provide abortions but rather offer counseling and services aimed at dissuading individuals from having an abortion. These centers often present themselves as clinics offering abortion services to attract those seeking abortion, only to provide anti-abortion counseling and services instead. These clinics often fall under the protection of the FACE Act, despite counseling against abortions, due to a broad interpretation of what can qualify as offering "reproductive health services." A clinic may qualify for as little as offering "referral services relating to the human reproductive system (including services relating to pregnancy)."[10]

---

[7] https://web.archive.org/web/20161110071743/http://www.nytimes.com/1993/03/12/opinion/the-death-of-dr-gunn.html#
[8] *Id.*
[9] Doctor's Slaying Seems to Prompt Action on Abortion Clinic Access Bill (1993, May 2). Congressional Quarterly Weekly Report, 757.
[10] 18 U.S.C. § 248(e)(5).

The application of the FACE Act to protect these anti-abortion clinics stems from protest acts against how these clinics operate in a deceptive manner. Given that the FACE Act prohibits damaging or attempting to damage the property of any facility that meets the Act's definition, activists who use graffiti or other similar protest methods can be ensnared in a federal prosecution.

A 2014 study concluded that 80 percent of crisis pregnancy centers (C.P.C.) included at least one false or misleading piece of medical information on their websites.[11] Also, it appears that some centers could share women's private health information with national anti-abortion networks, something that could be especially concerning in states that criminalize abortion. Nationwide, these centers outnumber abortion clinics 3-to-1.

As of May 5, 2022, since the FACE Act's creation, the U.S. Department of Justice has brought only 101 cases pursuant to this statute, and almost all of them involve allegations of more serious damage than just graffiti, they charge under the first portion of the Act, and they almost all involve actual abortion clinics.[12] [13] [14]

### III. The Offense Conduct & Sentencing Guidelines.

On June 24, 2022, the United States Supreme Court overturned *Roe v. Wade's* longstanding abortion protections in *Dobbs v. Jackson*. Emotions were high around the country as people struggled to comprehend what many, including Soren, understood to be a dangerous attack on womens' rights. On April 15, 2023, the Bowling Green Police Department was dispatched to HerChoice, located at 531 Ridge Street, in Bowling Green, Ohio, for a report of

---

[11] https://www.nytimes.com/interactive/2022/05/12/opinion/crisis-pregnancy-centers-roe.html
[12] See *United States v. Gallagher*, 2023 WL 4317264 (M.D. Tenn. July 3, 2023)
[13] https://theintercept.com/2023/02/03/abortion-clinics-face-act/.
[14] For a list of recent prosecutions, see https://www.justice.gov/crt/recent-cases-violence-against-reproductive-health-care-providers

criminal damaging. HerChoice is a pregnancy center that offers no abortion services. Upon arrival, the officer observed that the following words had been spray painted in blue on the east side of the building: "LIARS," "FAKE CLINIC," "Fund Abortion," "ABORT GOD," and "Jane's Revenge." Upon further investigation of the matter, Soren, a Bowling Green student, was identified as the individual that spray painted the building.

Soren, in explaining her conduct, wrote:

> Over my years as a student at Bowling Green, I learned that while HerChoice holds itself out as a reproductive health care center, in reality, it is part of a large network of anti-abortion centers that shames and harasses women… At the time I decided to do the graffiti, I was filled with fear and emotion due to the strident attack on abortion rights across the country and saw that HerChoice and these anti-abortion centers were emblematic of this attack. I chose to graffiti the front of HerChoice to make a statement against these attacks on our reproductive rights because I believed that would hurt no one and hoped it would spark conversations everywhere in Bowling Green. I took this action with a desire to draw attention to a cause I hold very dear, and I accept the consequences that follow."

As this is a Class B misdemeanor, the sentencing guidelines do not apply in this case. U.S.S.G. § 1B1.9. As the Court is still authorized to impose any sentence authorized by statute, it is still appropriate for the Court to be guided by the factors to consider for sentencing outlined in the Sentencing Guidelines.

**IV.    An Appropriate Sentence.**

Pursuant to Title 18, United States Code, Section 3553(a), when considering what sentence to impose, the Court must consider the following factors when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant:

At the outset, we can note that Soren has absolutely no criminal history, has no addiction to drugs or alcohol, and in all respects is a normal, charismatic, educated young person who is still undergoing the process of finding out who she is. She plans on finishing her education and looks forward to closing this chapter in her life.

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), overruled *Roe v. Wade* in the summer of 2022. The Supreme Court there held that there was no constitutional right to abortion and returned the power to regulate abortion healthcare to the states. Dobbs was deeply unpopular among voters and led to profound cultural changes in American society surrounding abortion. After the decision, several states immediately introduced abortion restrictions or revived laws that Roe and Casey had made dormant. As of 2023, abortion is greatly restricted in 17 states, including Ohio.[15] In national public opinion surveys, support for legalized abortion access rose 10 to 15 percentage points by the following year.[16] Referendums conducted in the decision's wake in Kansas, Montana, California, Vermont, Michigan, Kentucky, and Ohio uniformly came out in favor of abortion rights, generally by margins that were both bipartisan and overwhelming.[17]

Soren has taken responsibility for her actions and accepts the consequences. However, Soren's actions can only be properly understood when placed in the context of the wider legal and political landscape in which women in this country now find themselves. Soren, a passionate college student, was motivated to find some way to act in solidarity with women in this country who now face barriers to accessing healthcare that was previously protected.

---

[15] https://www.nytimes.com/interactive/2022/us/abortion-laws-roe-v-wade.html
[16] https://www.thecut.com/article/abortion-democratic-party-2024-elections.html
[17] https://www.nbcnews.com/politics/elections/abortion-rights-won-every-election-roe-v-wade-overturned-rcna99031

In her decision to graffiti HerChoice pregnancy center, Soren was expressing her dissent against what she perceives as the degradation of reproductive rights and the accessibility of safe, legal abortion services. She saw her act as a tangible form of protest—a direct challenge to an establishment she believes undermines women's autonomy regarding their reproductive decisions. Amidst a backdrop where legal protections and access to abortion services are increasingly under threat, Soren's graffiti was a means to confront and publicly critique the prevailing status quo, underlining the significance she places on reproductive freedoms. By singling out HerChoice, her aim was to cast a spotlight on the experiences of women misled or deprived of full-spectrum reproductive healthcare and abortion services, underscoring the deceit she associates with the center's operations as a profound injustice toward women in moments of vulnerability. She chose to graffiti because she had no intention to cause any permanent or lasting damage.

    2.    The Need for the Sentence Imposed to Promote Certain Statutory Objectives:

        (A)    To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.
        (B)    to afford adequate deterrence to criminal conduct;
        (C)    to protect the public from further crimes of the defendant; and
        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Soren's actions, while unlawful, were motivated by a perceived sense of injustice regarding reproductive rights. Though her intentions do not excuse the illegal conduct, they provide context that can inform a sentence designed to acknowledge the seriousness of graffiti while also considering the unique motivations behind her actions. No restitution is being sought in this case, nobody was injured, and the process of going through a federal prosecution has been an experience that Soren will never forget and one she wishes to never experience again. Soren has absolutely no criminal history and has an extremely low risk of reoffending in the future. She

has no addiction to drugs or alcohol, and she desires to continue her education. She has been on supervision since the date of her arrest and been in regular communication with her supervising officer and in total compliance with all conditions. In sum, the statutory objectives outlined here have been achieved and we request a sentence of time served.

Respectfully submitted,

/s/ Sarah Gelsomino
Sarah Gelsomino, 0084340
Friedman, Gilbert + Gerhardstein
50 Public Square, Ste. 1900
Cleveland, Ohio 44113
 (216) 241-1430

Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Sarah Gelsomino
SARAH GELSOMINO
*Attorney for Defendant*